JDN

**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THS ARIZONA

| | |
|---|---|
| DaJuan Torrell Williams,<br><br>Plaintiff,<br><br>v.<br><br>Mooney, et al.,<br><br>Defendants. | No. CV 16-04059-PHX-DGC (DMF)<br><br>**ORDER**<br>**AND**<br>**ORDER TO SHOW CAUSE** |

Plaintiff DaJuan Torrell Williams brought this civil rights action under 42 U.S.C. § 1983 against Arizona Department of Corrections (ADC) Sergeants Brenden Mooney, Jesse Bilbay, and Daniel Ostrander. (Doc. 18.) Before the Court are Defendants' Motion for Summary Judgment and Plaintiff's Motion for Special Court Order, which is construed as a Motion for Preliminary Injunction. (Docs. 43, 53.) The Court will grant Defendants' Motion in part and deny it in part, deny Plaintiff's Motion, and direct Plaintiff to show cause why the remaining Doe Defendants should not be dismissed.

**I.     Background**

In Count I of his First Amended Complaint, Plaintiff alleged that on April 5, 2015, Defendant Mooney used excessive force against him when Plaintiff was handcuffed and not resisting in anyway. (Doc. 18 at 5–6.) In Count VII, Plaintiff alleged that Defendant Bilbay failed to ensure that Plaintiff received timely medical attention for his injuries following the excessive force incident despite Plaintiff's requests. (*Id.* at 12.) In Count

1  XI, Plaintiff alleged that Defendant Ostrander also failed to ensure that Plaintiff received medical assistance. (*Id.* at 17.) Upon screening, the Court determined that Plaintiff stated an excessive force claim against Mooney and medical care claims against Bilbay and Ostrander and directed these Defendants to respond. (Doc. 19.)[1]

Defendants move for summary judgment on the grounds that (1) Mooney's actions did not constitute excessive use of force under the Eighth Amendment, (2) Plaintiff did not have a serious medical need, (3) Bilbay and Ostrander were not deliberately indifferent, and (4) Plaintiff did not suffer harm as a result of the delay in medical treatment. (Doc. 43.)

On May 7, 2018, Plaintiff filed his opposition to Defendants' Motion. (Doc. 52.) A week later, he filed a Motion for Special Court Order, which the Court construes as a Motion for Preliminary Injunction. (Doc. 53.)

**II.     Motion for Preliminary Injunction**

In his Motion, Plaintiff states that he was transferred to maximum custody on May 8, 2018, and all of his personal property—including legal paperwork—was confiscated, thereby hindering his ability to litigate this action and access the courts. (Doc. 53.) He seeks an order directing ADC to return his personal property and he requests that the Court provide copies to him of this filing because he is presently unable to get any staff assistance or obtain copies. (*Id.*)

Plaintiff filed the identical motion for injunctive relief in a separate civil rights action, *Williams v. Ryan, et al.*, CV 17-01833-PHX-DGC (DMF). In a July 5, 2018 order, the Court denied Plaintiff's request after determining that he failed to allege sufficient facts to establish actual injury. (CV 17-01833-PHX-DGC (DMF), Doc. 43.) *See Silva v. De Vittorio*, 658 F.3d 1090, 1102 (9th Cir. 2015) (to support an active interference claim, a prisoner must allege facts showing that officials' actions hindered

---

[1] The Court also found that Plaintiff stated excessive force claims against John and Jane Doe Defendants in Counts II–VI, X, and XII. (Doc. 19 at 11.) These claims and Defendants were not dismissed, but Plaintiff has not amended his pleading to name the Doe Defendants.

- 2 -

1 the ability to litigate and that, as a result, the prisoner suffered an actual injury), *overruled on other grounds by Richey v. Dahne*, 807 F.3d 1202, 1209 n.2 (9th Cir. 2015). Thus, the Court has already addressed Plaintiff's request for injunctive relief and, for reasons set forth in the July 5, 2018 order, finds that Plaintiff cannot demonstrate actual injury. The Court will deny Plaintiff's Motion for Preliminary Injunction.

### III. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden then shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*,

1 477 U.S. at 249. In its analysis, the court does not make credibility determinations; it must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255; *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3). Where the nonmovant is a pro se litigant, the court must consider as evidence in opposition to summary judgment all of the nonmovant's contentions set forth in a verified complaint or motion. *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004).

**IV. Relevant Facts**

On April 5, 2015, at approximately 5:00 p.m., Plaintiff was returning from recreation and was going to take a shower. (Doc. 44, Defs.' Statement of Facts 2 & Ex. 2, Pl. Dep. 20:7–8, Nov. 16, 2017 (Doc. 44-1 at 16).) Plaintiff was handcuffed and escorted by Officer Gutierrez, and asked Gutierrez if he could get Plaintiff some shower shoes. (*Id.*, Ex. 2, Pl. Dep. 20:1–18, 25:16–18.) According to Plaintiff, everyone shares a shower and no one would take a shower barefoot. In fact, the prison provides everyone with shower shoes when they first arrive. (*Id.* 31:5–20.) Plaintiff did not have his shower shoes because he had just been moved and all his property—including his shower shoes—had been extracted from his cell and had not yet been returned. (*Id.* 32:1–11.) Gutierrez said he would look and see if he could find some shower shoes and proceeded to put Plaintiff in the shower, but Plaintiff said that he would wait in his nearby cell while Gutierrez got the shoes. (*Id.* 20:12–24.) The prisoner in the cell next to Plaintiff's attempted to let Plaintiff borrow his shower shoes, but Gutierrez would not allow it. (Doc. 52, Ex. 2, Sudiata Decl. at 1.)

Gutierrez escorted Plaintiff into his cell and locked the cell. (Doc. 44, Ex. 2, Pl. Dep. 22:9–16, 23:5–6.) Normal procedure provides that officers lock the cell door and then open the trap in the cell door to uncuff the prisoner. (*Id.* 22:19–25.) Gutierrez opened the trap to take off Plaintiff's handcuffs, but Plaintiff said he would wait until Gutierrez came back with the shower shoes. (*Id.* 23:6–8.) Plaintiff thought that

- 4 -

Gutierrez would just go grab the shower shoes and come back so it was unnecessary to uncuff him and come right back and cuff him again. (*Id.* 23:21–24:1.) In response, Gutierrez slammed the trap door shut and said "now you ain't getting shit," and left. (*Id.* 23:9–11.)

After Gutierrez left, Plaintiff "jumped" his handcuffs, meaning he moved his cuffed hands from behind his back to the front of his body. (*Id.* 48:13–24, 49:5–16.) About 10 minutes later, Gutierrez came back to Plaintiff's cell. (*Id.* 26:1–6.) Gutierrez asked if Plaintiff was ready to uncuff. Plaintiff refused to uncuff and told Gutierrez to get a sergeant. (*Id.* 26:11–24.) Gutierrez said "all right," and he left. (*Id.* 26:23–27:2.)

About 20 minutes after Gutierrez left, Officer Lopez came to Plaintiff's cell and asked what was going on. (*Id.* 29:2–14.) Plaintiff told her that he was waiting for the sergeant, and when she asked what the problem was, he explained that he was trying to get some shower shoes. (*Id.* 30:1–15.) Lopez said that the sergeant was on his way, and she left. (*Id.* 30:16–23.)

About 15 minutes after Lopez left, Mooney and seven other officers arrived at Plaintiff's cell. (*Id.* 36:16–22, 37:4–8.)[2] Mooney opened the trap door and said "give me those fucking cuffs." (*Id.*, Ex. 2, Pl. Dep. 38:12–23.) Plaintiff got up from his bunk and went to open his mouth, at which point Mooney said "I'm not talking to you until you give me those fucking cuffs." Plaintiff turned around and sat back down on his bunk. (*Id.* 39:3–9.) Mooney asked Plaintiff why he was acting like a little bitch, to which Plaintiff did not reply. (*Id.* 40:13–22.) Mooney then asked Plaintiff if he wanted the officers to spray him and "come in there and fuck you up and take all your property." (*Id.* 40:23–41:1.) In response, Plaintiff challenged Mooney to call an Incident Command System (ICS) and do everything he was threatening to do. (*Id.* 41:24–42:4.)[3]

---

[2] Mooney attests that he does not have any recollection of the events on April 5, 2015. (Doc. 44, Ex. 1, Mooney Decl. ¶ 5.)

[3] Plaintiff explains that when an ICS is initiated, other supervisors, such as lieutenants or captains, become involved and everything is recorded on camera. (Doc. 44, Ex. 2, Pl. Dep. 42:5–15.)

- 5 -

At that point, Mooney pulled the pin in the door, which must be pulled before the cell door can open, and he instructed "control" to open the cell door. (*Id.* 42:20–43:20, 44:6–14.) The cell door opened, and Mooney and four or five other officers entered the cell. (*Id.* 44:16–45:3.) Plaintiff stood up as they entered the cell, and Mooney grabbed Plaintiff's face and pushed it down. (*Id.* 48:4–9, 51:6–12.) Plaintiff resisted the pressure to go down, but he did not move his hands—which were in front of him—or try to fight or grab anyone. (*Id.* 52:24–53:6.) Mooney and the officers were shoving and pulling Plaintiff in different directions, trying to get him to the floor. (*Id.* 55:12–17.) Plaintiff was resisting, and they were all tussling and wrestling. At some point, Plaintiff ended up face down on the floor with his hands above his head. (*Id.* 56:5–17, 57:2–4.) At least two officers were holding Plaintiff's hands and kneeling on his arms. Other officers were kneeling on his legs. (*Id.* 57:6–9.) Someone got on Plaintiff's back, grabbed his face and pulled his neck back, thereby choking Plaintiff. (*Id.* 57:16–58:7.) Plaintiff continued to move and tried to get up. (*Id.* 58:18–59:9.) Plaintiff could not breathe. (*Id.* 61:7.)

While the officers were on top of Plaintiff, they removed his cuffs and pulled his hands behind his back. (*Id.* 68:20–25.) At least four officers were still holding Plaintiff down, and Plaintiff was no longer resisting at all. (*Id.* 69:3–12.) An officer asked Mooney if he wanted them to put the cuffs back on Plaintiff, and Mooney said no. (*Id.* 68:25–2, 68:18–20.) Mooney ordered the officers to get Plaintiff up and hold his arms. The officers lifted Plaintiff off the floor and then slammed him against the wall, smashed his face into the wall, and held him there. (*Id.* 69:23–70:2; Doc. 52 at 3.) The officers began to back up towards the cell door while still holding on to Plaintiff's arms. (Doc. 44, Ex. 2, Pl. Dep. 70:14–16, 71:13–21.) When all the officers were outside of the cell, they started to close the door and released Plaintiff's arms as the door closed. (*Id.* 72:12–19.) Plaintiff did not say anything to the officers, and they left. (*Id.* 72:22–25.)

At 6:00 p.m. that same day, Officer Pyle completed an Information Report on the incident involving Plaintiff. (Doc. 44, Ex. 1, Attach. A (Doc. 44-1 at 8).) In this Report, Pyle wrote that he and Gutierrez escorted Plaintiff from recreation to his cell, but at his

1   cell, Plaintiff would not uncuff after several verbal directives. (*Id.*) Pyle wrote that he
2   then called Mooney, and after several directives from Mooney, Plaintiff placed his hands
3   in the trap and they removed his cuffs. (*Id.*)

4           Plaintiff waited until 10:00 p.m., when there was a shift change, and then, about
5   10:15 p.m., asked the officer conducting a walk through if he could speak to a lieutenant.
6   The officer said there were no lieutenants on shift. (*Id.*, Ex. 2, Pl. Dep. 80:20–81:11,
7   81:22–82:1.) Plaintiff asked the officer who the shift commander was, and the officer
8   said Sergeant Bilbay. Plaintiff requested that the officer ask Bilbay to speak with
9   Plaintiff and said that it was an emergency situation. (*Id.* 82:1–5.)

10          The same officer conducted another walk through around 11:15 p.m. and told
11  Plaintiff that he had informed Bilbay of Plaintiff's request. (*Id.* 82:10–14.) Plaintiff told
12  the officer that it was an emergency and that he was requesting medical treatment, but he
13  did not want to tell the officer what the issue was about and preferred to speak to the shift
14  commander. (*Id.* 82:14–21.)

15          Plaintiff then wrote out his first emergency informal grievance, in which he
16  detailed the incident that occurred with Mooney and the other officers. (*Id.* 82:22–25;
17  Doc. 52, Ex. 3 (Doc. 52 at 21).) When the same officer did his 12:00 a.m. walk through,
18  Plaintiff again requested to speak to Bilbay, stated that he was seeking medical treatment,
19  and handed the officer the emergency grievance. (Doc. 44, Ex. 2, Pl. Dep. 82:25–83:7.)
20  The officer assured Plaintiff that he would make sure Bilbay got the grievance. (*Id.*
21  82:7–8.)

22          At 1:00 a.m., the officer returned and told Plaintiff he had read the grievance and
23  had spoken to Bilbay, and that Bilbay was going to come talk to Plaintiff. (*Id.* 83:9–13.)
24  The officer said that he did not want to get involved, so he was returning the emergency
25  grievance to Plaintiff and Plaintiff could give it to Bilbay himself. (*Id.* 83:13–18.)

26          Sometime between 1:00 and 2:00 a.m., Bilbay came to speak to Plaintiff, and
27  Plaintiff handed him the emergency grievance, which documented what happened.
28  Plaintiff requested medical treatment. (*Id.* 86:18–87:7.) Bilbay took the grievance, read

it, and said that he would pass it on to administration in the morning, and said he would see if the nurse could see Plaintiff. (*Id.* 87:18–88:6.) Bilbay told Plaintiff that there was not enough staff on the graveyard shift to take Plaintiff to medical, but when the day shift came on in the morning, medical would see Plaintiff. (*Id.* 88:10–15.) Bilbay then left, and Plaintiff did not interact with him again. (*Id.* 89:12–90:11.)

The day shift came on at 6:00 a.m., and Plaintiff asked a few times to speak to the shift commander. (*Id.* 94:2–5.) The shift commander was Ostrander. When Ostrander did not come, Plaintiff wrote a second emergency grievance, which detailed everything that had happened, including Plaintiff's conversation with Bilbay, and gave the grievance to an officer to give to Ostrander. (*Id.* 91:25–92:6, 94:6–7.) The officer later told Plaintiff that he notified Ostrander and gave him the grievance, but Ostrander never came to talk to Plaintiff. (*Id.* 94:13–25.)

Around 9:25 a.m., Plaintiff was escorted to medical by a medical escort officer. When they got to medical, Plaintiff told the officer everything that had happened and that he had been assaulted. (*Id.* 98:7–10.) Plaintiff was sitting on the examination table when he was talking to the officer, and a nurse in the room heard everything. (*Id.* 98:12–17.) The officer asked if the nurse would examine Plaintiff, and she said no. She did not examine Plaintiff or take any vitals. (*Id.* 99:2–17.) Instead, the nurse said Plaintiff was just there for ACE bandages. (*Id.* 99:21–23.)

On April 9, 2015, three officers came to Plaintiff's cell and told him to cuff up because they were going to take him to medical. (*Id.* 102:2–20.) The officers put Plaintiff on a gurney, and one officer had a camera and began recording everything. (*Id.* 102:25–103:3.) When Plaintiff got to medical, the Assistant Deputy Warden was there and talked with Plaintiff about what happened. This conversation was recorded on the camera. (*Id.* 103:3–8.)[4] A nurse was there while Plaintiff spoke with the Assistant Deputy Warden. She examined Plaintiff and asked if he was hurting anywhere. (*Id.*

---

[4] In his Response, Plaintiff states that ADC claims to no longer have the video recording from April 9, 2015. (Doc. 52 at 9.)

- 8 -

1 103:22–104:2.) Plaintiff said that he had some soreness, but wasn't really hurt, and the
2 nurse noted that he had a little knot on his head. (*Id.* 104:4–7.) Plaintiff did not require
3 any treatment. (*Id.* 105:3–6.)

4 **V.     Excessive Force Claim Against Mooney**

5     **A.     Legal Standard**

6 Use of excessive force against a prisoner violates the prisoner's Eighth
7 Amendment right to be free from cruel and unusual punishment. *Graham v. Connor*, 490
8 U.S. 386, 39394 (1989). The use of force is constitutional if it is used in a good faith
9 effort to keep or restore discipline; it is unconstitutional if it is used "maliciously and
10 sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 320–
11 21 (1986). Not "every malevolent touch by a prison guard gives rise to a federal cause of
12 action"; thus, de minimis uses of physical force, provided that the force is not "repugnant
13 to the conscience of mankind," do not offend the Constitution. *Hudson v. McMillan*, 503
14 U.S. 1, 9–10 (1992).

15 A court considers five factors in determining whether a defendant's use of force
16 was malicious and sadistic for the purpose of causing harm: (1) the extent of the injury,
17 (2) the need for force, (3) the relationship between the need and the amount of force used,
18 (4) the threat "reasonably perceived" by the officials, and (5) "any efforts made to temper
19 the severity" of the force. *Id.* at 7 (citing *Whitley*, 475 U.S. at 321). When reviewing
20 these *Hudson* factors, a court must remember that prison officials "should be accorded
21 wide-ranging deference in the adoption and execution of policies and practices that in
22 their judgment are needed to preserve internal order and discipline and to maintain
23 institutional security." *Whitley*, 475 U.S. at 321–22 (quoting *Bell v. Wolfish*, 441 U.S.
24 520, 547 (1979)).

25 Excessive force cases often turn on credibility determinations, and the excessive
26 force inquiry "nearly always requires a jury to sift through disputed factual contentions,
27 and to draw inferences therefrom[.]" *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir.
28 2005) (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)). Therefore,

"summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Smith*, 394 F.3d at 701.

### B. Discussion

#### 1. Extent of Injury

The extent of a prisoner's injury may suggest whether force used could plausibly have been thought necessary in a particular situation. *Hudson*, 503 U.S. at 7. The extent of injury may also provide some indication of the amount of force applied. *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). Although the extent of a prisoner's injury is relevant in the use of force determination, it is not decisive because a prisoner can state a claim even if he did not suffer a significant injury. *See Wilkins v. Gaddy*, 559 U.S. 34, 37–38 (2010); *Schwenk v. Hartford*, 204 F.3d 1187, 1196 (9th Cir. 2000) (the attack need not result in permanent injury). A push or shove that causes no discernible injury generally fails to state a valid excessive force claim, but injury and force "are only imperfectly correlated, and it is the latter that ultimately counts." *Wilkins*, 559 U.S. at 38. In *Wilkins*, even though the plaintiff's alleged injuries—a bruised heel, lower back pain, increased blood pressure, migraine headaches, dizziness, and mental anguish—were not deemed significant, they only limited the possible damages and did not preclude his excessive force claim. *Id.* at 35, 39.

In his amended pleading, Plaintiff alleged that he suffered injuries to his head, face, knees, wrist, and back, which caused pain and mental agony. (Doc. 18 at 5.) In his deposition, Plaintiff testified that he received a knot on his forehead when officers slammed his face against the wall, and that he was choked and kneed and suffered bruises on his back, arms, and legs. (Doc. 44, Ex. 2, Pl. Dep. 85:18–19, 86:1–6.) Defendant Mooney argues that there is no evidence of serious or permanent injuries and that no injuries were noted by medical staff following the incident. (Doc. 43 at 8.) Again, serious or permanent injuries are not necessary to support an excessive force claim. Taking Plaintiff's allegations as true, there is a genuine dispute as to the material facts

- 10 -

regarding the extent of his injuries. In any case, even minor injuries would only limit Plaintiff's potential damages and not preclude his claim. *See Wilkins*, 559 U.S. at 39.

### 2. Need for Force

The Ninth Circuit has held that "the force which was applied must be balanced against the need for that force: it is the need for force which is at the heart of the [excessive force determination]." *Alexander v. City and Cnty. of S.F.*, 29 F.3d 1355, 1367 (9th Cir. 1994), *abrogated on other grounds by Cnty. of L.A. v. Mendez*, 137 S. Ct. 1539 (2017).

Defendant Mooney contends that Plaintiff's refusal to obey orders and his repositioning of his hands in front of his body justified the use of some force. (Doc. 43 at 8–9.) Plaintiff argues that immediately upon his arrival at the cell front, Mooney inflamed the situation by acting unprofessionally, cussing at Plaintiff, and calling him a "little bitch." (Doc. 52 ¶ 2.) According to Plaintiff, Mooney instigated the attack, thereby suggesting that force was not necessary. (*Id.*¶ 3.)

There is no dispute that by the time Mooney arrived at Plaintiff's cell, Plaintiff had moved his cuffed hands to the front of his body. In his declaration, Mooney avers that when a handcuffed prisoner repositions his hands in front of himself, the handcuffs are considered a weapon and the prisoner is considered assaultive. (*Id.*, Ex. 1, Mooney Decl. ¶ 6.) Nor is there any dispute that Plaintiff did not comply with directives to give Mooney his handcuffs. Although Plaintiff's failure to follow orders to uncuff did not pose an immediate grave danger to officers or other prisoners because Plaintiff was locked in his cell, in the prison context there can be a more subtle threat posed when an inmate refuses to obey an order:

> Orders given must be obeyed. Inmates cannot be permitted to decide which orders they will obey, and when they will obey them . . . . Inmates are and must be required to obey orders. When an inmate refuse[s] to obey a proper order, he is attempting to assert his authority over a portion of the institution and its officials. Such refusal and denial of authority places the staff and other inmates in danger.

*Lewis v. Downey*, 581 F.3d 467, 476 (7th Cir. 2009) (citation omitted). The Ninth Circuit has ruled that the use of some force may be necessary "if a prisoner refuses after adequate warning to move from a cell or upon other provocation presenting a reasonable possibility that slight force will be required." *Spain v. Procunier*, 600 F.2d 189, 195 (9th Cir. 1979).

That the incident was initially triggered by Gutierrez's unreasonable conduct in refusing to get shower shoes, or that Mooney used unprofessional language, are not determinative. Plaintiff's refusal to comply with orders constituted a challenge to prison officials and their authority and escalated tensions. In light of Plaintiff's refusal to follow orders and the location of the handcuffs, there was a need for some force to remove Plaintiff's handcuffs. Plaintiff admits that he resisted when Mooney and the officers entered his cell, and he continued to resist as the officers tried to make him go to the ground. (Doc. 44, Ex. 2, Pl. Dep. 52:10–17, 56:8–10.) At this juncture, Mooney and the officers were reacting to Plaintiff's refusal to follow orders and his ongoing resistance.

But once Plaintiff was face down on the ground with his arms outstretched above his head, two officers were holding his hands and kneeling on his arms, other officers were kneeling on his legs, and an officer was kneeling on his back. (*Id.* 56:22–57:11.) Plaintiff states that he was still moving, but with all of the officers kneeling on him there was not much he could do. (*Id.* 59:3–5.) By this point, the officers had Plaintiff restrained. An officer nonetheless proceeded to choke Plaintiff as he laid face down on the floor. (*Id.* 57:10–11, 58:1–7.) Then, after the officers removed Plaintiff's cuffs and he had "given in" and was not resisting at all, the officers lifted him up and slammed him against the wall. (*Id.* 69:10–70:2.) Defendant Mooney fails to address whether there was a need for force after the officers had restrained Plaintiff and he stopped resisting. (*See* Doc. 43 at 8–9.) A reasonable jury could find that, although there was initially a need for some force, after Plaintiff was restrained by officers on the floor and he was uncuffed and no longer resisting, there was no need for further force and the officers' actions in choking Plaintiff and then lifting him up and slamming him into the wall were excessive.

### 3. Relationship Between the Need for Force and the Force Used

In analyzing the relationship between the need for force and the force used, a simple overreaction by an officer is not enough to establish an Eighth Amendment violation. The standard is malicious and sadistic force, not merely objectively unreasonable force, which is applicable under the Fourth Amendment. *See Clement v. Gomez*, 298 F.3d 898, 903 (9th Cir. 2002); *see also Hudson*, 503 U.S. at 9 (not every malevolent touch gives rise to an Eighth Amendment claim).

The initial force used by Mooney and other officers when they entered the cell was not disproportionate to the amount of force needed to subdue a prisoner who is noncompliant and resisting. Plaintiff's facts show that the officers successfully restrained Plaintiff and he stopped resisting.

The officers continued to use force, however, and the amount of force applied in choking and slamming Plaintiff against the wall appears inordinate compared to the need. Defendant Mooney argues that because Plaintiff had previously resisted officers' efforts to remove the handcuffs, it was necessary to maintain control over him, and that slamming him into the wall amounts only to a de minimis use of force and was not excessive. (Doc. 43 at 9.) But officers may use force only in proportion to the need in each situation. *See Spain*, 600 F.2d at 195 ("[t]he infliction of pain and the danger of serious harm may be necessary if there is a threat of an equal or greater harm to others, as is reflected in the doctrine of self-defense . . . . Inherent in the doctrine of self-defense is the concept of proportion"). Plaintiff was being held by at least four officers and was not resisting. In these circumstances, there is a question of fact whether choking Plaintiff and slamming him into the wall constituted de minimis uses of force akin to a mere "push or shove" that would not support an Eighth Amendment claim, or whether such conduct was more than de minimis. *See Wilkins*, 559 U.S. at 38. A reasonable jury could find that these actions were more than de minimis and thereby conclude that Defendant Mooney and the other officers intended to cause Plaintiff harm.

///

#### 4. Threat Perceived

The fourth *Hudson* factor considers "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them." *Whitley*, 475 U.S. at 321.

Defendant Mooney argues that in light of Plaintiff's refusal to relinquish the handcuffs and his assaultive posture—with handcuffs in front of his body—Mooney reasonably perceived a threat that Plaintiff would inflict harm on prison staff. (Doc. 43 at 9–10.) Plaintiff contends that if Mooney genuinely believed that Plaintiff posed a threat, ADC policy required him to activate ICS protocols before taking any action, which Mooney failed to do. (Doc. 52 at 4.) A failure to follow policy does not rise to an Eighth Amendment violation. *See Cousins v. Lockyer*, 568 F.3d 1063, 1070 (9th Cir. 2009) (alleged failure to follow prison policy does not establish federal constitutional violation); *Gardner v. Howard*, 109 F.3d 427, 430 (8th Cir. 1997) ("there is no § 1983 liability for violating prison policy. [The plaintiff] must prove that [the official] violated his constitutional right"). On Plaintiff's facts, it was reasonable for Mooney to initially perceive some threat based on Plaintiff's noncompliance and movement of his handcuffed hands.

Again, the problem arises after Plaintiff was controlled – when he was face down on the floor with officers kneeling on his arms, legs, and back. Mooney presents no argument that Plaintiff would have posed a threat in this position, nor does he argue that Plaintiff posed a threat after he stopped resisting and was lifted by the officers. Consequently, there are questions of fact whether Mooney reasonably perceived a threat before Plaintiff was choked and slammed against the wall.

#### 5. Efforts to Temper Force

Defendant Mooney maintains that he and the other officers tempered the use of force by giving Plaintiff multiple directives to relinquish the handcuffs and warnings that physical force would be used, but Plaintiff failed to heed those warnings. (Doc. 43 at 10.)

Defendants' own evidence indicates that there were a number of measures

- 14 -

1 Mooney could have taken before entering Plaintiff's cell and using force. In his
2 declaration, Mooney avers that in the circumstances presented, his practice would be to
3 give a prisoner verbal directives to allow officers to remove the cuffs, and, if the prisoner
4 refuses, initiate an ICS, and then use aerosol spray to get the prisoner to comply.
5 (Doc. 44, Ex. A, Mooney Decl. ¶ 6.) If the prisoner still does not comply, Mooney states
6 he would then consider use of a stun gun before finally entering the cell and using
7 physical force. (*Id.*) Defendants proffer a copy of ADC policy DO 804, *Inmate Behavior*
8 *Control*, which governs the use of force by officers. (Doc. 55 at 15–30.) The policy
9 provides that staff should use progressive force starting with "psychological," then
10 "aerosol sprays," and then "stun devices." (Doc. 55 at 16.) The policy also directs that
11 "[i]n all applications involving the use of force, patience shall be emphasized and
12 consideration given to alternative solutions, such as waiting the inmate out, before
13 initiating or escalating the use of force." (*Id.* at 18.) Mooney did not attempt any
14 psychological response, was not patient, and did not use aerosol spray or a stun gun
15 before entering the cell and using physical force. In short, Mooney failed to take any
16 steps to temper the amount of force used.

17 On this record, there are genuine issues of material fact whether Mooney's use of
18 force was made in a good faith effort to maintain discipline or for the purpose of causing
19 harm. Mooney is therefore not entitled to summary judgment.

20 **VI. Medical Care Claims against Bilbay and Ostrander**

21 **A. Legal Standard**

22 Under the Eighth Amendment standard, a prisoner must demonstrate that a
23 defendant acted with "deliberate indifference to serious medical needs." *Jett v. Penner*,
24 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).
25 There are two prongs to the deliberate-indifference analysis: an objective standard and a
26 subjective standard. First, a prisoner must show a "serious medical need." *Jett*, 439 F.3d
27 at 1096 (citations omitted). A "'serious' medical need exists if the failure to treat a
28 prisoner's condition could result in further significant injury or the 'unnecessary and

wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted). Examples of indications that a prisoner has a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin*, 974 F.2d at 1059–60.

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent. *Jett*, 439 F.3d at 1096. An official acts with deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment," *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (internal citations and quotation marks omitted), or when they fail to respond to a prisoner's pain or possible medical need. *Jett*, 439 F.3d at 1096.

Even if deliberate indifference is shown, to support an Eighth Amendment claim, the prisoner must demonstrate harm caused by the indifference. *Jett*, 439 F.3d at 1096; *see Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmful).

**B. Discussion**

**1. Serious Medical Need**

Taking Plaintiff's facts as true, he suffered bruises to his wrists, arms, and legs and a knot on his forehead. (Doc. 44, Ex. 2, Pl. Dep. 86:1–6, 107:16–108:1.) He suffered back pain, soreness and pain in his knees, and his neck was sore. (*Id.* 107:1–12, 108:18–109:4.) Plaintiff sought medical help for four days following the incident and was finally examined on April 9, 2015. But he testified that by that time, he did not require any

treatment. (*Id.* 102:17–18, 104:8–10, 105:3–6.)

Generally, cuts and bruises or swelling do not constitute a serious medical need. *See MacFalling v. Nettleton*, No. CV 17-02399 SVW (AFM), 2017 WL 3498616, at *7 (C.D. Cal. Aug. 15, 2017) (cuts, abrasions, and swollen hands resulting from overly tight handcuffs did not rise to level of a significant injury); *Telles v. Stanislaus Cty. Sheriff's Dep't*, No. 1:10-CV-01911 AWI, 2011 WL 2036962, at *5 (E.D. Cal. May 24, 2011) (cuts and bruises not serious medical need where plaintiff did not allege the severity of those injuries); *see also Trejo v. Gomez*, No. C-92-4485 EFL (PJH), 1996 WL 506910, at *3 (N.D. Cal. Aug. 16, 1996) (bruises and contusions did not support a finding of a serious medical need). Absent any specific facts or evidence that he suffered further significant pain or injury as a result of failing to get immediate treatment for bruises or the knot on his head, Plaintiff cannot establish that his injuries were significant such that they constituted a serious medical need. *See McGuckin*, 974 F.2d at 1059 (a serious medical need exists "if the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain"); *Porter v. Goord*, No. 04-CV-0485F, 2009 WL 2180580, at *12 (W.D. N.Y. Jul.22, 2009) (finding no serious medical condition where inmate complained only of a bump on his head; nurse found dime-sized bump on head and small lacerations on the lip and neck; and inmate did not allege that he suffered further significant pain or injury or that injuries did not heal as a result of delayed or denied treatment).

### 2. **Deliberate Indifference**

Even assuming, arguendo, that Plaintiff could show a serious medical need and that Bilbay and Ostrander were aware of the serious medical need, Plaintiff's own testimony—that a few days later he required no treatment and there was "nothing to fix"—shows that any delay in obtaining a medical examination did not result in harm. (Doc. 44, Ex. 2, Pl. Dep. 105:3–6.)

On this record, Plaintiff cannot support deliberate indifference claims against Bilbay and Ostrander, and summary judgment will be granted on the medical care claims. *See Jett*, 439 F.3d at 1096; *Hunt*, 865 F.2d at 200.

**VII. Doe Defendants**

As mentioned, in the Screening Order, the Court did not dismiss the John and Jane Doe Defendants; instead, it directed Plaintiff to amend his pleading if he discovers the identity of these Defendants. (Doc. 19 at 11.) There has been sufficient opportunity for discovery in this action, and Plaintiff has not sought to amend his pleading to identify the Doe Defendants. He will therefore be required to show cause within 30 days why the Doe Defendants should not be dismissed without prejudice. Failure to respond to this Order to Show Cause will result in dismissal of the Doe Defendants.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is withdrawn as to Defendants' Motion for Summary Judgment (Doc. 43) and Plaintiff's Motion for Preliminary Injunction (Doc. 53).

(2) Plaintiff's Motion for Preliminary Injunction (Doc. 53) is **denied**.

(3) Defendants' Motion for Summary Judgment (Doc. 43) is **granted in part** and **denied in part** as follows:

    (a) the Motion is **granted** as to the medical care claims in Counts VII and XI, and these Counts are dismissed; and

    (b) the Motion is otherwise **denied**.

(4) Bilbay and Ostrander are dismissed as Defendants.

(5) Within **30 days** from the date of this Order, Plaintiff must show cause why the remaining Doe Defendants should not be dismissed without prejudice.

Dated this 17th day of September, 2018.

David G. Campbell
Senior United States District Judge